# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., <br> Plaintiffs, <br> v. <br> BARR LABORATORIES, INC., <br> Defendant. | C.A. No. 05-700 (***) |

## EXPERT REPORT OF DALE H. HOSCHEIT, ESQ.

**I.  Introduction**

1.  I have been retained by the attorneys for defendant Barr Laboratories, Inc., to investigate and offer opinions on matters related to the subject litigation. I am being compensated for my work on this matter at my normal rate of $520.00/hour for consulting time and for deposition and trial testimony, plus related and necessary expenses. Beyond those payments, I will not receive any other financial compensation regardless of the outcome of this case.

2.  I am a member of the bar of the District of Columbia and have been in patent practice for over 45 years. I am a shareholder in the law firm of Banner & Witcoff, Ltd. I am an adjunct professor at George Mason University School of Law in Arlington, Virginia, where I have taught the course, Biotechnology Patent Practice, and currently teach the course, Trade Secrets. I am also the coordinator for and teach in a graduate course at the John Hopkins University entitled "The Legal Aspects of Biotechnology". Further, I am a member of the Advisory Board of BNA's Patent, Trademark and Copyright Journal. My curriculum vitae is attached as Exhibit A.

3.  In my over 45 years of patent practice, I have prepared numerous evaluations of patent validity, enforceability, and claim scope, as well as provided many freedom-to-operate opinions to various clients. A substantial portion of my practice is in the pharmaceutical and biotechnology area. In addition to over 40 years in private practice with the firm of Banner & Witcoff, Ltd., and its predecessors, I spent five years as in-house Patent Counsel for International Minerals and Chemical Corporation located in Skokie, Illinois at that time.

4.  Cited throughout this report are materials and sources I have relied on in connection with my opinions. In addition, I may use charts, graphs, or other demonstrative exhibits to support any potential testimony at trial. I also may make reference to the patent laws (35 United States Code), the Rules of Practice (37 Code of Federal Regulations), the Manual of Patent Examining Procedures ("MPEP"), and case law.

5.  In addition to the specific opinions set forth herein, I may respond to additional testimony and information that becomes available during deposition, at trial, or otherwise, including any opinions put forth by Boehringer's experts. I may also provide a further overview of the patents and file histories for Griss et al. U.S. Patents 4,731,374, 4,843,086 and 4,886,812 (respectively, "the '374 patent," "the '086 patent," and "the '812 patent") (collectively "the Griss et al. patents").

## II. The Griss et al. Patents

6.  The '374, '086, and '812 patents, each entitled "Tetrahydro-Benzthiazoles, The Preparation Thereof and Their Use as Intermediate Products or as Pharmaceuticals", have identical disclosures and each claims the benefit of U.S. patent application Serial No. 6/810,947, filed December 19, 1985. Each also purports to claim the benefit of German patent applications DE 3447075 (filed December 22, 1984) and DE 3508947 (filed March 13, 1985).

7.  The Griss et al. patents contain claims to tetrahydro-benzthiazoles within the following general formula, pharmaceutical compositions containing such tetrahydro-benzthiazoles, and the use of such tetrahydro-benzthiazoles for the treatment of identified conditions:

[Chemical structure diagram showing a bicyclic tetrahydro-benzthiazole with substituents $R_1$, $R_2$ on one nitrogen and $R_3$, $R_4$ on another nitrogen]

$R_1$ represents a hydrogen atom, an alkyl group having 1 to 6 carbon atoms, an alkenyl or alkynyl group each having 3 to 6 carbon atoms, an alkanoyl group having 1 to 6 carbon atoms, a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, whilst the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms,

$R_2$ represents a hydrogen atom or an alkyl group with 1 to 4 carbon atoms,

$R_3$ represents a hydrogen atom, an alkyl group with 1 to 7 carbon atoms, a cycloalkyl group having 3 to 7 carbon atoms, an alkenyl or alkynyl group having 3 to 6 carbon atoms, an alkanoyl group having 1 to 7 carbon atoms, a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, whilst the phenyl nucleus may be substituted by fluorine, chlorine or bromine atoms,

$R_4$ represents a hydrogen atom, an alkyl group with 1 to 4 carbon atoms, an alkenyl or alkynyl group having 3 to 6 carbon atoms or

$R_3$ and $R_4$ together with the nitrogen atom between them represent a pyrrolidino, piperidino, hexamethyleneimino or morpholino group.

3

### III. U.S. Patent 4,731,374

8.  Application Serial No. 6/810,947 ("the '947 application") was filed December 19, 1985. The claims as filed contained the following general subject matter (Ex. 46 at BARR114-18):

| | |
|---|---|
| Claims 1-5 | Genus and subgenus tetrahydro-benzthiazoles |
| Claim 6 | 2-Amino-6-dimethylamino-4,5,6,7-tetrahydro-benzthiazole |
| Claim 7 | 2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole |
| Claim 8 | A pharmaceutical composition comprising a tetrahydro-benzthiazole of claim 3 |
| Claim 9 | A method of lowering the blood pressure with a compound of claims 3-7 |
| Claim 10 | A method for lowering the heart rate with a compound of claims 3-7 |
| Claim 11 | A method of treating Parkinsonism with a compound of claims 3-7 |
| Claim 12 | A method of treating Parkinson's disease with a compound of claims 3-7 |
| Claim 13 | A method of treating schizophrenia with a compound of claims 3-7 |
| Claims 14-15 | Methods for making a tetrahydro-benzthiazole of claim 1 |

9.  During prosecution of the '947 application, the examiner (Examiner Ceperley) mailed on September 11, 1986 the following restriction requirement (*Id.* at BARR274-78):[1]

   I.  Claims 1-8 (at least part of each), drawn to benzothiazole compounds and a pharmaceutical composition, classified in Class 548, subclasses 161, 163 and 164.

   II. Claims 1-5 and 8-10 (at least part of each), drawn to pyrrolidinyl-substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 514, subclass 367.

---

[1] The examiner used the term "benzothiazole" to refer to "tetrahydro-benzthiazole". In addition, the examiner described substituents formed by $R_3$ and $R_4$ together with the nitrogen between them as, for example, "pyrrolidinyl" instead of "pyrrolidino" as appears in the claims.

4

    III.    Claims 1-4 and 8 (at least part of each), drawn to piperidinyl-substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 546, subclass 192.

    IV.    Claims 1-4 and 8 (at least part of each), drawn to hexamethylimino substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 540, subclass 603.

    V.    Claims 1-4 and 8, drawn (at least part of each) morpholinyl-substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 544, subclass 135.

    VI.    Claim 14, drawn to a method of preparing benzothiazole compounds using a thiourea reactant.

    VII.    Claim 15, drawn to a method of preparing benzothiazole compounds using a disulfide reactant classified based on type of compounds formed.

    VIII.    Claims 9 and 10, drawn to a method of lowering blood pressure or heart rate classified based on type of compound used.

    IX.    Claims 11 and 12, drawn to a method for treating Parkinsonism, classified based on type of compound used.

    X.    Claim 13, drawn to a method for treating schizophrenia, classified based on type of compound used.

10.   The examiner further required the applicants to "elect either (A) one of the compound groups I-V and one of the utility groups VIII-X (composition and utility to be limited to elected compound type for examination), or (B) one of the process groups VI and VII." *Id.* at BARR277.

11.   In response, the applicants elected Group II (pyrrolidinyl-substituted benzthiazole compounds) and Group IX (method for treating Parkinsonism). *See id.* at BARR279. This election was consistent with the examiner's restriction requirement, as the applicants elected one of the compound groups and one of the utility groups, with both composition and utility limited to pyrrolidinyl-substituted benzthiazoles.

5

12.     The '374 patent issued from the '947 application on March 15, 1988 with the following general categories of claims (Ex. 1 at BOE34, 46-47):

| | |
|---|---|
| Claims 1-6 | Tetrahydro-benzthiazole compounds where $R_3$ and $R_4$ together with the nitrogen atom between them form a pyrrolidino group |
| Claim 7 | A pharmaceutical composition for treating parkinsonism or Parkinson's Disease comprising a tetrahydo-benzthiazole of claims 3-6 |
| Claims 8-9 | Methods of treating parkinsonism or Parkinson's disease with a tetrahydo-benzthiazole of claims 3-6 |

### IV.   U.S. Patent 4,843,086

13.     Application Serial No. 7/124,197 ("the '197 application") was filed November 23, 1987 and was denominated as a divisional application of the '947 application. *See* Ex. 286 at BARR500. There was no preliminary amendment to the claims, meaning that the claims of the application as filed were the same claims as the claims originally filed in the '947 application. *See id.* at BARR501, BARR491-95.

14.     In an Office Action mailed April 7, 1988, the examiner (Examiner Gerstl) stated that originally-filed claims 6, 7, 9, 10 and 13 of the '197 application were allowed. *Id.* at BARR503-05. Claims 1-5, 8, 11, and 12, however, were rejected for double patenting over the '374 patent, apparently because those claims still encompassed tetrahydro-benzthiazoles claimed in the '374 patent. *Id.* As the examiner stated, "Although the conflicting claims are not identical, they are not patentably distinct from each other because they overlap." *Id.* at BARR504.[2] Claim 8 was also rejected under 35 U.S.C. § 112 and claims 14 and 15 under 35 U.S.C. § 103. *Id.* at BARR503-05.

---

[2] Alan Stempel, the attorney prosecuting this application, wrote in a response to the April 7, 1988 Office Action that claims 11 and 12, as filed, "are directed, in part, to the same subject matter covered by claims 8 and 9 of the '374 patent". Ex. 286 at BARR595-96.

6

15.  The applicants mailed a response and information disclosure statement on October 7, 1988, in which they voluntarily cancelled the originally filed claims (claims 1-15), even though the examiner had indicated his intention to allow 5 of them, and added new claims 16-56. *Id.* at BARR578-600. Despite the fact that two of the original claims – claims 6 and 7 – which had been noted as "allowed" by the examiner, were compound claims, the new claims were exclusively method claims. The amendment acknowledged that cancelled claims 6 and 7 had been allowed (*Id.* at BARR592-93):

> Claims 1-5, 8 and 15, which are rejected, have been cancelled in the interest of advancing the prosecution of this application and for reasons which are given below.
>
> Claims 6 and 7, which had been allowed, have been cancelled for reasons which are given below.
>
> None of the new claims are directed to the subject matter of former claims 1-8. Applicants reserve the right to present claims directed to the subject matter of these cancelled claims in a divisional application, under 37 CFR 1.60.

16. The "reasons . . . given below" related to a possibly interfering application of Eli Lilly, Serial No. 747,748 ("the Eli Lilly '748 application"), which was called to the examiner's attention in the same filing. *Id.* at BARR598-600. The Eli Lilly '748 application was said to have been filed June 24, 1985 and to disclose a subgenus of the compounds disclosed and originally claimed in the '197 application. *Id.* at BARR599. It was asserted, however, that the Eli Lilly third-party application did not claim any of the methods encompassed by the pending method claims and would not support the making of such claims. *Id.* at BARR599-600. The applicants further stated (*Id.* at BARR600):

> In view of the particular pertinence of U.S. Patent Application Serial No. 747,748 to claims 1-8, these claims have been cancelled and will be reinstated in a divisional application under 37 CFR 1.60. It is believed that so doing will advance the prosecution of

7

the above-captioned application and that issues presented by this reference will be more easily dealt with in said divisional application.

17. The method claims introduced by the amendment, claims 16-55, were allowed, and the '086 patent issued June 27, 1989 with 40 claims.[3] *Id.* at BARR601-02; Ex. 2. These method of treatment claims included methods of using compounds of Groups I-V of the restriction requirement imposed during prosecution of the '947 application (which had already issued as the '374 patent) for the treatment of the disorders of Groups VIII-X of that restriction requirement.[4] Ex. 2 at BOE29-32. The claim pattern is as follows:

| | |
|---|---|
| Claims 1-10 | Methods for lowering blood pressure (claim 9 is specific to the use of 2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole) |
| Claims 11-20 | Methods for lowering heart rate (claim 19 is specific to the use of 2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole) |
| Claims 21-30 | Methods for treating Parkinsonism or Parkinson's disease (claim 29 is specific to the use of 2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole) |
| Claims 31-40 | Methods for treating schizophrenia (claim 39 is specific to the use of 2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole) |

*Id.*

18. The prosecution history of the '197 application indicates that the restriction requirement imposed during prosecution of the '947 application did not carry over during examination of the '197 application. The examiner in the '197 application (Examiner Gerstl)

---

[3] Process claim 56, which corresponded to rejected original claim 14, was cancelled. Ex. 286 at BARR602.

[4] No claims covered the use of compounds of Group II for the method of Group IX (if categorized according to the restriction requirement imposed during prosecution of the '947 application).

made no reference to the restriction requirement imposed in the '947 application, but rather examined all the claims and allowed claims in a pattern that was inconsistent with the earlier restriction requirement – *i.e.*, he allowed claims from Groups I, VIII, and X (if categorized according to the '947 restriction requirement). Accordingly, the examiner for the '197 application, by his actions, withdrew the restriction requirement. No new restriction requirement was imposed during prosecution of the '197 application.

19.    The applicants appeared to acknowledge that the '947 restriction requirement no longer applied when, for example, they voluntarily withdrew the allowed claims in the '197 application and re-submitted claims for multiple methods of treatment (*i.e.*, Groups VIII-X (if categorized according to the '947 restriction requirement)) employing compounds from multiple restriction groups. These claims – which issued in the '086 patent – were not consistent with the restriction requirement imposed during prosecution of the '947 application, which required the applicants to "elect either (A) one of the compound groups I-V and one of the utility groups VIII-X (composition and utility to be limited to elected compound type for examination), or (B) one of the process groups VI and VII."

20.    The '086 patent expired 17 years after issuance on June 27, 2006.

V.    **U.S. Patent 4,886,812**

A.    **Overview of the Prosecution History**

21.    Application Serial No. 7/256,671 ("the '671 application") was filed October 12, 1988, approximately seven months after the '374 patent issued. The '671 application was denominated as a divisional application of the '197 application, which had been denominated as a divisional application of the '947 application. Ex. 99 at BARR674.

9

22. The prosecution histories indicate that the '671 application was filed voluntarily by the applicants, not as a result of a restriction requirement or any administrative action by the Patent and Trademark Office. As discussed above, during prosecution of the '197 application, the examiner allowed claims 6 and 7, but the applicants voluntarily cancelled those allowed claims and deferred pursuing them until they could file a separate application (the '671 application). The applicants stated that they took these actions in order to address issues presented by the Eli Lilly '748 application.

23. Original claims 1-8 of the '671 application corresponded to original claims 1-8 presented in the '947 and '197 applications, except that "pyrrolidino", the subject of the '374 patent claims, was deleted by preliminary amendment filed with the application. *See id.* at BARR662-66, BARR677. Claims 1-7 issued substantially unchanged as claims 1-7 of the '812 patent. Ex. 3 at BOE14-15. Composition claim 8 was later amended to overcome a rejection under 35 U.S.C. § 112. Ex. 99 at BARR784-85. A second preliminary amendment and information disclosure statement (discussed further below) added two compound claims that correspond to issued claims 9 and 10 of the '812 patent. *Id.* at BARR779-80.

24. In the only Office Action in the prosecution, mailed December 28, 1988, the examiner (Examiner Gerstl) indicated that claims 6 and 7 were allowed but rejected the remaining broader compound claims (claims 1-5) and the pharmaceutical composition claim (claim 8) under the doctrine of double patenting over claims 1-7 of the '374 patent. *Id.* at BARR776-77. The applicants' response, mailed on May 9, 1989, argued, among other things, that "there is no 'anticipation-type' double patenting" by the claims of the '374 patent because "pyrrolidino" had been deleted in the preliminary amendment. *Id.* at BARR784-87.

25. The '812 patent issued December 12, 1989, with an original expiration date of December 12, 2006, approximately 5½ months after the expiration date of the '086 patent. Ex. 3 at BOE2.

26. The claims submitted by the applicants in the '671 application and which issued in the '812 patent are from Groups I and III-V (if categorized according to the '947 restriction requirement). That is inconsistent with the election framework set forth in the '947 restriction requirement. That further indicates that the restriction requirement imposed during prosecution of the '947 application did not carry over during examination of the '197 and '671 applications.

27. The '812 patent was nominated for a patent term extension under 35 U.S.C. § 156. Ex. 99 at BARR810. No terminal disclaimer has been filed for the '812 patent.

### B. The December 8, 1988 Second Preliminary Amendment and Information Disclosure Statement

28. In a second preliminary amendment and information disclosure statement mailed December 8, 1988, the applicants called the examiner's attention to the Eli Lilly '748 application and a foreign equivalent, European Patent Application No. 207,696, published July 1, 1987 (the "European '696 application"), each assigned to Eli Lilly & Co. *See* Ex. 99 at BARR680. A copy of the Eli Lilly '748 application was simultaneously provided to the U.S. Patent and Trademark Office. Ex. 99 at BARR693-718.

29. In this submission, in a section entitled "Possibly Interfering Application of Another", the applicants admitted that the Eli Lilly applications disclosed and claimed a subgenus of compounds that were disclosed and claimed in the subject '671 application. It was represented, however, that the Eli Lilly applications were not "prior art" because the publication and filing dates were "later than the effective filing date of the above-captioned application":

11

> European '696 discloses tetrahydro (thi or ox) azoles of the formula:
>
> [Chemical structure: bicyclic compound with $R^4R^3N$— substituent on one side and —$NR^1R^2$ on the other, with Y substituent]
>
> wherein $R^1$ and $R^2$ are individually H, methyl, ethyl or n-propyl; $R^3$ and $R^4$ are individually H, methyl, ethyl, n-propyl or allyl; and Y is O or S.
>
> When Y is S, the compounds of European '696 represent a subgenus of the compounds disclosed and originally claimed in the above-captioned application. However, European '696 does not represent prior art because its publication date is later than the effective filing date of the above-captioned application.
>
> U.S. Application Serial No. 747,748 contains the same disclosure as European '696. It is not available as prior art because its filing date is later than the effective filing date of the above-captioned application. (The effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed).
>
> It is believed that Serial No. 747,748 is still pending. As filed, U.S. Application Serial No. 747,748 contained claims directed to compounds of the above formula XX.

Ex. 99 at BARR 680.[5]

30.  In my opinion, statements in this submission regarding the effective filing date of the '671 application were inaccurate, and were material to the examination of the '671 application. In particular, the applicants' misrepresentations concerning their effective filing date pertained directly to the question of whether there would be an interference with the "still pending" Eli Lilly '748 application prior to issuance of any claims of the '671 application.

---

[5] Similar representations concerning the Eli Lilly applications were made during prosecution of the '947 and '197 applications. Ex. 46 at BARR349-50; Ex. 286 at BARR598-600.

31.     Reference to "effective filing date" in the amendment and disclosure statement was a representation that the German application filed December 22, 1984 – DE 3447075 – supported the full scope of the claims of the pending application under 35 U.S.C. § 119 (37 C.F.R. § 1.601(g)).[6] In order to obtain the benefit of an earlier application, it is necessary that the earlier application comply with requirements of 35 U.S.C. § 112, including the presence of a sufficient written description of the later claimed subject matter. A comparison of the specification of the '812 patent and the December 22, 1984 and March 13, 1985 German priority documents[7] demonstrates that additional disclosure was added after the filing of the German priority applications. For example, at column 1 lines 33 et. seq. of the '812 patent, $R_1$ includes the statement "whilst the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms". Ex. 3 at BOE3. At column 3 lines 5 et seq. of the '812 patent, particularly preferred compounds are said to include those in which $R_1$ represents 2-chloro-benzyl, 4-chloro-benzyl, or 3,4-dichloro-benzyl. Ex. 3 at BOE4. No such disclosure appears in the December 22, 1984 German priority application or the March 13, 1985 German priority application.

32.     It is my understanding that the disclosure of $R_1$ substituents whereby the "phenyl nuclei may be substituted by 1 or 2 halogen atoms," or whereby $R_1$ could represent a 2-chloro-benzyl, 4-chloro-benzyl, or 3,4-dichloro-benzyl, was not added until the filing of the '947 application on December 19, 1985, and is not supported elsewhere by either of the German applications – i.e., it is new matter. As such, the applicants' representations that December 22, 1984 was the effective filing date of their application were inaccurate.

---

[6] 37 C.F.R. § 1.601(g) (1988) defines the "effective filing date" of an application or patent as "the filing date of an earlier application accorded to the application or patent under 35 U.S.C. 119, 120, or 365".

[7] I have reviewed English translations of the German priority documents (Exhibit 53 and BARR209351-403).

13

33. Claims 1-4 and 8 of the '671 application pending as of December 8, 1988, as well as claims 1-4 and 8 of the '812 patent, included this new matter – *i.e.*, they encompassed permutations in which $R_1$ includes a phenyl nuclei substituted by 1 or 2 halogen atoms (claims 1 and 2) or in which $R_1$ is a 2-chloro-benzyl, 4-chloro-benzyl, or 3,4-dichloro-benzyl (claims 3, 4, and 8) – and therefore were not entitled to an effective filing date before December 19, 1985. As such, the Eli Lilly '748 application reflected a prior invention of another with respect to those claims of '671 application that could have precluded issuance of the claims of the '671 application had the examiner declared an interference.

34. Section 2303 of the Patent and Trademark Office Manual of Patent Examining Procedure in effect as of December 1988[8] included directions to examiners that an interference normally will *not* be declared if the difference in the "effective filing dates" of two co-pending applications is more than six months. The applicants' representation concerning the effective filing date of the '671 application stated that the effective filing date was 6 months and 2 days earlier than the Eli Lilly '748 application (December 22, 1984 versus June 24, 1985). However, as discussed above, the "effective filing date" for at least a portion of the '671 application (and for five of the pending claims) was December 19, 1985, well after the June 24, 1985 Eli Lilly U.S. filing date. The '812 patent ultimately issued without ever having to meet a 35 U.S.C.

---

[8] Section 2303 in relevant part read:

> Interferences will not be declared between pending applications if there is a difference of more than 3 months in the effective filing dates of the oldest and the next oldest applications, in the case of inventions of a simple character, or a difference or more than 6 months in the effective filing dates of the applications in other cases, except in exceptional situations, as determined and approved by the group director. One such exceptional situation would be where one application as the earliest effective filing date based on foreign priority and the other application has the earliest effective United States filing date. If an interference is declared, all applications having the interfering subject matter should be included.

14

§ 102(g) priority challenge with Eli Lilly, a challenge in which Eli Lilly would have been able to rely on work conducted in the United States to support a priority date earlier than June 24, 1985.

35.    The materiality of the applicants' misrepresentation concerning the effective filing date of their application is reinforced by the fact that they did not submit copies of the German applications during prosecution of the '671 application, let alone a translation of those documents. The provisions of 37 C.F.R. § 1.55 require an applicant to file a sworn translation of a foreign language application if it was relied on to overcome the date of a reference relied on by the examiner.[9] Here, in order to overcome any reliance on the Eli Lilly '748 application by the examiner, the applicants represented that they were entitled to claim priority back to their original German application. However, no English translation, sworn or otherwise, was filed by the applicants, nor was either of the German applications. And while the German applications (but not their English translations) were made part of the '947 application prosecution history, Ex. 46 at BARR127-236 – an application reviewed by a different examiner – the '947 application had previously issued as the '374 patent on March 15, 1988, approximately seven months before the '671 application was filed. By the time the '671 application was filed, the

---

[9] 37 C.F.R. § 1.55(a) (1988) reads in relevant part:

> The claim for priority and the certified copy of the foreign application specified in the second paragraph of 35 U.S.C. § 119 must be filed in the case of interference (§ 1.630); when necessary to overcome the date of a reference relied upon by the examiner; or when specifically required by the examiner; and in all other cases they must be filed not later than the date the issue fee is paid. If the papers filed are not in the English language, a translation need not be filed except in the three particular instances specified in the preceding sentence, in which event a sworn translation or a translation certified as accurate by a sworn or official translator must be filed.

application file for the '374 patent would not have been maintained in the Examining Group.

Dated: March 28, 2007

*[signature: Dale H. Hoscheit]*
Dale H. Hoscheit, Esq.

# EXHIBIT A

# DALE H. HOSCHEIT

Dale Hoscheit, a long time shareholder in Banner & Witcoff, concentrates in federal and United States International Trade Commission litigation, licensing, counseling on patent matters, and protection of intellectual property rights. He was one of the lawyers representing Chakrabarty in the landmark Supreme Court decision, <u>Diamond v. Chakrabarty</u>, which held that life forms could be patented. He has practiced patent law for over 40 years.

He received a Bachelor of Science in Chemical Engineering with *high honors* from the University of Illinois in 1951 and a Juris Doctor from the same institution in 1956. His honors include Phi Lambda Upsilon and Sigma Tau. Mr. Hoscheit worked as a chemical engineer for Standard Oil of California and later, after beginning the practice of law, as patent counsel for the International Minerals and Chemical Corporation.

A speaker and panelist, Mr. Hoscheit has addressed numerous panels on biotechnology and United States patent law. Among these are the Annual Biotechnology Patent Conferences of the American Type Culture Collection, 1983-1994; the 14th Miami Winter Symposium, the 82nd Annual Meeting of the American Society of Microbiologists; the 1983 U.S. Tissue Culture Conference; the Vth International Congress of Culture Collection in Bangkok; the 1987 American Bar Association Annual Meeting; BioFair Tokyo 1988; and the 1989 and 1990 Patent and Trademark Office Day.

Mr. Hoscheit is an Adjunct Professor at George Mason Law School, has taught a course in Biotechnology Patent Law and teaches a course in Trade Secrets. He has also been a lecturer in Legal Aspects of Biotechnology, a graduate course at The Johns Hopkins University. He is a member of the Advisory Board of BNA's Patent, Trademark & Copyright Journal.

Mr. Hoscheit's professional memberships include The American Bar Association, The Bar of the Federal Circuit and of the United States Supreme Court, The Bar Association of the District of Columbia, and The American Intellectual Property Law Association. He is admitted to the bar in the District of Columbia.

He is a member of the board of directors of Sibley Memorial Hospital, Washington, D.C.

**BANNER & WITCOFF, Ltd.**
CHICAGO · WASHINGTON, D.C. · BOSTON · PORTLAND, OR

Publications:

Patent Protection for Cell Lines, Hybridomas, and Processes Utilizing Cultured Cells, *In Vitro*, Monograph No. 5, pp. 236-239 (1984).

Enforcement of Biotechnology Patents in the United States, BioSymposium Tokyo, pp. 529-533 (1988).

Papers entitled "Biotechnology Patent Law - An Overview" which summarize current developments in patent law are included in the ATCC Conference workbook for each of the years 1983-1994, 1996 and 1997.

Cases in which Expert deposition testimony has been given within the last four years

Lek Pharma v. GlaxoSmithKline, CA 203 CV 909 (E.D. Va.)

Teva Pharmaceuticals USA, Inc. v. Pfizer Inc. 03 CV-7423 and 03 CV-4979 (LAP) (S.D.N.Y.)

Dey v. Eon Labs, SACV-04-00079; SACV-04-00243 (C.D. Cal.)

Genetech v. Insmed, 04-CV-05429 (N.D. Cal.)

Novartis Corp., et al. v. Teva Pharmaceuticals USA, Inc., 2:04-CV-04473 (HAA-MF) (D.N.J.)

Tyco Healthcare, et al. v. Daniels Sharpsmart, et al., 2:04-CV-00229-RAJ-TEM (E.D. Va.)